UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------X
                                        :  04-16410
In re:                                  :
                                        :  One Bowling Green
     KOLLEL MATEH EFRAIM, LLC           :  New York, New York
                                        :
               Debtor.                  :  July 20, 2005
----------------------------------------X
```

TRANSCRIPT OF HEARING RE MOTION TO DISMISS OR CONVERT FOR
ADEQUATE PROTECTION OR RELIEF FROM THE STAY
            BEFORE THE HONORABLE STUART M. BERNSTEIN
               CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                 MARK FRANKEL, ESQ
                                Backenroth, Frankel & Krinsky,
LLP
                                489 Fifth Avenue, 28th Floor
                                New York, New York  10017


For Helen May:                  GERALD ORSECK, ESQ.
                                Orseck Law Offices
                                Box 469, 1924 State Route 52
                                Liberty, New York 12754


For All Refrigeration           ADAM ROSEN, ESQ.
and Equipment:                  Scarcella, Rosen and Slome
                                333 Earle Ovington Boulevard
                                Uniondale, New York 11553






Court Transcriber:              MARY GRECO
                                TypeWrite Word Processing Service
                                356 Eltingville Boulevard
                                Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1

2                          I N D E X

3
                                              Further
4              Direct  Cross  Redirect  Recross  Redirect

5
WITNESSES
6
Jean Barbanti          5
7
Jack Lefkowitz        29
8

9

10
Debtor's
EXHIBITS:                              Marked   Received
11

12      6/3/04 Letter Agreement              19

13      9/22/04 Letter Agreement             19

14

15

16

17

18

19

20

21

22

23

24

25

3

1            THE COURT:  Please be seated.  Kollel Mateh Efraim.

2 Is the movant ready?

3            MR. FRANKEL:  Yes, Your Honor.

4            THE COURT:  You're not the movant.

5            MR. ORSECK:  Oh.

6            THE COURT:  Is the movant ready?

7            MR. ORSECK:  Gerald Orseck for Helen May.  We filed

8 objections.

9            THE COURT:  This is a motion to dismiss or convert

10 for adequate protection or relief from the stay; right?

11            MR. ORSECK:  Yes.

12            THE COURT:  The debtor is ready?

13            MR. FRANKEL:  Yes, Your Honor.

14            THE COURT:  Okay.  Call your first witness.

15            MR. ORSECK:  Yes.  Your Honor, are we going to

16 litigate the motion to dismiss first or --

17            THE COURT:  Well, that seems to be a threshold issue

18 as opposed to what?

19            MR. ORSECK:  The objection to the confirmation.  I

20 think it's -- our case we would ask be deemed to be also

21 considered with respect to our objection.

22            THE COURT:  We haven't gotten to the confirmation

23 hearing.  As I said in chambers when I reviewed it, the

24 disclosure statement, I had a question of whether -- I thought

25 your client was impaired under the plan and entitled to vote.

4

1  It may be that they can modify the plan right now to cash you

2  out.  Whether or not you're still impaired after they retain

3  the right to sue, I don't know.

4          Why don't we deal with the threshold question of

5  whether or not the case should be dismissed or converted on the

6  theory that it's a bad faith filing and kind of the related

7  argument that if it stays, you're entitled to adequate --

8  greater protection than apparently Judge Blackshear ordered.

9          MR. FRANKEL:  Your Honor, before we hear from

10  witnesses --

11          THE COURT:  Yes.

12          MR. FRANKEL:  There was not an affidavit of service

13  of the motion filed and we believe that it was not served on

14  creditors.

15          MR. ROSEN:  Your Honor, Adam Rosen; Scarcella, Rosen

16  and Slome --

17          THE COURT:  Who do you represent?

18          MR. ROSEN:  All Refrigeration and Equipment which

19  was -- it's one of the largest creditors and my client is here

20  today pursuant to a subpoena.  Although we received the

21  subpoena, we did not receive a motion to dismiss according to

22  my client.

23          THE COURT:  Do you have an affidavit of service?

24          MR. ORSECK:  I do not, Your Honor.

25          THE COURT:  Motion to dismiss has to be served on all

5

1 creditors and parties in interest under Rule 2002(a).

2          MR. ORSECK:  There were three creditors listed.  We

3 did not --

4          THE COURT:  All right.  Then I won't consider the

5 motion to dismiss today but I will consider your application

6 for more adequate protection.

7          MR. ORSECK:  Okay.

8          THE COURT:  All right.

9          MR. ORSECK:  Jean Barbanti.  I have a witness.

10         THE COURT:  Okay.

11         MR. ORSECK:  Jean Barbanti.

12         THE COURT:  Take the stand.  But before you sit would

13 you raise your right hand?

14             (Jean Barbanti, Movant's Witness, Sworn.)

15         THE COURT:  Okay.  Please be seated.  Speak into the

16 microphone.  State and spell your name.

17         THE WITNESS:  My name is Jean Barbanti, B-A-R-B-A-N-

18 T-I.

19                     DIRECT EXAMINATION

20 BY MR. ORSECK:

21 Q    Where do you live?

22 A    Liberty, New York.

23 Q    What do you do?

24 A    I'm a real estate broker and consultant.

25 Q    In what area?  In what geographical area?

6

1  A    Most of Sullivan and Orange County.

2  Q    How long have you been engaged in that business?

3  A    About approximately 30 years.

4  Q    Do you do appraisals?

5  A    Yes, I do.

6  Q    Would you tell the Court some of the entities that you

7  have done appraisals for?

8  A    Major banks, Fleet Bank, Citibank.  Just about every major

9  bank.  I have a list.  If you'd like I can read it.

10  Q    All right.  I'll hand this up to you.

11  A    Thank you.  I've done appraisals for North Star Bank;

12  Prudential Insurance Company; Sullivan County ARC; US Small

13  Business Administration Town of Liberty; Bank of New Jersey;

14  Ingersoll Rand Town of Bethel; Van Eton Oil Company; First

15  Federal Savings and Loan of Rochester; Jefferson Bank of

16  Pittsburgh; Land Record Resources, Floral Park, New York;

17  Lender Services, Pittsburgh; Bank of New York, Monticello;

18  Ellenville National Bank, Ellenville; National Westminster

19  Bank, Melville, New York; New York Job Development Authority,

20  New York; County of Sullivan, Monticello, New York; The Ivy

21  Guild, Greenhouses, New York and Massachusetts; the Pines Hotel

22  in Fallsburg; Estate of -- the John Lennon Estate in New York,

23  New York; Stevensville Country Club; Sullivan County Golf

24  Course and Country Club; First Capital Mortgage Corp.;

7

1 Grossinger Hotel and Country Club; Aaron Stallman and Sons;

2 French Woods Festivals of Performing Arts in Hancock; Grays

3 Wood Works in Granville; Granite Hotel and Country Club --

4 Q    Is it much longer?

5 A    Yeah, about another page.

6 Q    I think that that's enough.  Now, you read us a list that

7 include a wide variety of entities, banks, insurance companies

8 and resort hotels; is that correct?

9 A    Right.

10 Q    Now, have you testified in Court as an expert concerning

11 values of real property in Sullivan County?

12 A    Yes, I have.

13 Q    Have you testified concerning values of resort hotels?

14 A    Yes.

15 Q    Have you testified in Bankruptcy Court itself?

16 A    Yes, I have.

17 Q    Have you testified more than two or three or four dozen

18 times?  I don't want to put words in your mouth.

19 A    No, I've probably --

20         THE COURT:  Why don't you just ask him how many times

21 he's testified?

22 A    Probably a half a dozen times.

23         THE COURT:  Why don't you just ask him how many times

24 he's testified as an expert?

8

1          MR. ORSECK:  Yeah.

2   Q    How many --

3   A    Okay.  I've testified as an expert about a half a dozen

4   times.

5   Q    Okay.  Now, at my request did you evaluate the fair rental

6   value --

7          THE COURT:  Before you answer that question, is there

8   any objection to this witness's qualifications?  I assume he's

9   going to testify as to the value of the property issue.

10          MR. FRANKEL:  No, Your Honor.

11          THE COURT:  All right.  Then I'll deem him an expert

12   for the purposes of valuing the property.  Go ahead.

13   Q    At my request did you evaluate the fair rental value of

14   the Meadows Resort at the Fosterdale intersection Route 17B in

15   Sullivan County?

16   A    Yes, I did.

17   Q    Are you familiar with the property?

18   A    Yes, I am.

19   Q    Would you tell the Judge when you first became familiar

20   with the property and how long you --

21   A    Long ago when it was still owned by Forkman [Ph.] Circle

22   and then it was purchased by -- I believe Mr. Griffins

23   purchased it after that.  I know of the property.  I've been on

24   the property.  I have seen the property.

9

1 Q    About how many hotel rooms does it -- well no, instead of

2 that, why don't you tell us what it consists of and --

3 A    All right.  It comprises of approximately 60 acres.  It

4 has 104 rooms, hotel rooms, and it's located at a very active

5 area called Fosterdale Four Corners.  It's just beyond Four

6 Corners.

7 Q    What amenities does it have or --

8 A    Well, the usual amenities of a place of that nature;

9 dining facilities and commercial kitchen.  Normal things for

10 what they were used for really.  Similar to a hotel or motel.

11 Q    Now, were you given information as to an arm's length

12 purchase price which had been arrived at within the last year

13 or so?

14 A    Yes, I was.

15 Q    What was that amount that you were given?

16 A    $1.4 million I believe it was.

17 Q    Now, taking into consideration your knowledge of

18 properties of this type of the arm's length fair market value

19 established by an accurate sale, do you have an opinion as to

20 the rental value, the fair rental value of that property as of

21 this time or within the last year?

22 A    Yes, I do.

23 Q    What is that amount?

24 A    Well, it was $1.4 million for the sale and anybody that

10

1  would purchase at an arm's length deal or the deals that I've

2  been in would look to get at least a 10% return on their money

3  which if you were going to rent the rooms you would be looking

4  at about $140,000.00 of income.

5  Q    All right.  Now --

6            THE COURT:  Is that on an annual basis?

7            THE WITNESS:  On an annual basis.

8  Q    Okay.  What about taxes, insurance, et cetera?

9  A    That would be a profit after taxes and everything were

10 paid.

11 Q    You mean for the landlord?

12 A    Yes.

13            MR. ORSECK:  I have no further questions.  Oh, one

14 more.

15 Q    Does that jibe, the 140, economically with 100 rooms?

16 A    Yes, it would.

17            MR. ORSECK:  Okay.

18            THE COURT:  Cross examination?

19            MR. FRANKEL:  No, Your Honor.

20            THE COURT:  You can step down.  Thank you.  Call your

21 next witness.

22            MR. ORSECK:  That concludes only with respect to

23 adequate security.

24            THE COURT:  Are you also seeking relief from the

11

1 stay?

2          MR. ORSECK:  Yes, we are.

3          THE COURT:  All right.  Do you have any additional

4 evidence on that issue?

5          MR. ORSECK:  On relief from the stay?  Yes.  They're

6 by way of legal arguments.

7          THE COURT:  Okay, legal argument.  Do you have any

8 other evidence though?

9          MR. ORSECK:  On relief from the stay?  No, sir.

10         THE COURT:  Okay.  Do you have any witnesses?

11         MR. FRANKEL:  No, Your Honor.

12         THE COURT:  All right.  You said that the return was

13 140 net of taxes.  Who's paying the taxes under Judge

14 Blackshear's order now?

15         MR. ORSECK:  It's silent.  It's just $5,000.00.  I

16 was not present nor have I seen a transcript nor has anybody

17 represented to me what the transcript shows but --

18         THE COURT:  Well, you're asking me though, you're

19 asking me to fix in a monthly payment, are you saying that it's

20 140 divided by 12?

21         MR. ORSECK:  Plus whatever the real estate taxes --

22         THE COURT:  Well, I don't have any evidence of that

23 and there's no testimony that that's something that a tenant

24 would normally pay.

12

1          MR. ORSECK:  He -- I think --

2          THE COURT:  Okay.

3          MR. ORSECK:  -- Mr. Barbanti said it would be net.

4          THE COURT:  All right.

5          MR. ORSECK:  We have the documentation on what the

6  taxes are in the record before you, in the written record.

7          THE COURT:  Okay.

8          MR. FRANKEL:  Your Honor, I know that the witness

9  testified that this is what an owner would expect to obtain but

10  I don't know that there's any testimony about comparable

11  rentals and what the market would bear in that area.  We've

12  heard a lot lately about how rentals at least in this area are

13  not in the same -- are not in a direct proportion to carrying

14  costs and interest.

15          THE COURT:  I haven't heard any testimony other than

16  this witness who has testified that based on his experience

17  that the reasonable return would be 10%.  That's the only

18  testimony I have and the only evidence I have.

19          MR. FRANKEL:  Could I have five minutes, Judge?

20          THE COURT:  You want to reopen the record?

21          MR. FRANKEL:  No.  We'll just move forward.

22          THE COURT:  All right.  Well, it seems to me I have

23  credible testimony that in substance the reasonable monthly

24  value to the debtor, however it chooses to use the property, is

13

1  140 divided by 12 plus whatever the taxes are because Mr.

2  Barbanti did state that the owner would expect to receive the

3  140 net of taxes from which I infer that the tenant would

4  either be expected to pay the taxes or the rent would be

5  increased to cover the taxes.  As adequate protection payments

6  on a going forward basis I'm going to direct the debtor, and I

7  don't know what the numbers are, you can figure out the math,

8  to pay the $140,000.00 divided by 12 plus the taxes as they

9  come due since the debtor, you didn't say it, but the debtor

10 has 100% of the premises I take it.  There's no question about

11 that.

12         MR. FRANKEL:  Your Honor, is that prospective or --

13         THE COURT:  I said on a going forward basis.  We'll

14 make it effective July 1st since he made the motion before July

15 1st and he's entitled to adequate protection at that point.

16         MR. FRANKEL:  Okay.

17         THE COURT:  All right.  So you can settle an order to

18 that effect.

19         MR. ORSECK:  Yes, sir.

20         THE COURT:  Now, what do you want to do about this

21 motion to dismiss?  You have to give notice to the creditors.

22         MR. ORSECK:  Your Honor, on the motion to dismiss I'm

23 quite comfortable in representing to the Court that testimony

24 we elicit on the objections is indistinguishable --

14

1          THE COURT:  The objections to the confirmation of the

2  plan?

3          MR. ORSECK:  Yeah, and the disclosure statement.

4  However --

5          THE COURT:  So, do you want to just go forward with

6  the confirmation hearing?  I'll deem the plan to be amended.  I

7  guess we should deal with the disclosure statement issue first

8  but based on our discussions in chambers I raise the issue that

9  I thought your client was impaired under the plan because the

10 debtor was not paying the money to your client.  The debtor was

11 going to hold it in escrow and that altered your client's

12 contractual rights.  As I understand it, the debtor then made

13 the proposal well we'll just cash him out and we'll reserve our

14 rights, whatever they are, to sue to recover for fraud or

15 whatever other theories they may have.

16          I guess the initial question is are you still

17 impaired?

18          MR. ORSECK:  The answer, it's our position that we

19 are still impaired.

20          THE COURT:  Why?

21          MR. ORSECK:  Well, the real estate contract is --

22 we're not an unsecured creditor.  The real estate contract

23 provides for $1,500.00 a day after the scheduled closing date

24 in the event that there is no closing.

15

1          THE COURT:  Right.  Okay.  So what are you owed with

2 that $1,500.00 a day?

3          MR. ORSECK:  Well, the debtor was paid up as of

4 September 27.  Let's go October 1st.

5          THE COURT:  So you're owed almost ten months?

6          MR. ORSECK:  Yes, yes.  That's when they stopped

7 payment on the check.

8          THE COURT:  So, do you know how much that is?

9          MR. ORSECK:  Well, $1,500.00 would be -- it's a lot

10 of money.

11          THE COURT:  I know.  But you're saying that's what

12 they have to pay you I guess to un-impair you and I'm just

13 asking you what it is because --

14          MR. ORSECK:  Yeah, it would be $45,000.00 a month for

15 however many months it is.  I use my fingers.

16          THE COURT:  Well, it's about ten months.

17          MR. ORSECK:  November, December, January, February,

18 March, April, May, June, July times nine which would be roughly

19 $400,000.00; is it not?

20          THE COURT:  What's the debtor's position?

21          MR. FRANKEL:  The debtor's position is that that

22 provision was a provision that was intended to apply to a

23 failure to close and a penalty until the debtor vacated.  If

24 there is a closing, the debtor's position is that that

16

1  $1,500.00 a day does not apply.  It was for the event of a

2  failure to close altogether and requirement that the debtor

3  vacate the premises.

4          THE COURT:  Wait a minute.  You mean if you fail to

5  close altogether you just have to continue to pay $1,500.00 a

6  day forever?

7          MR. FRANKEL:  Yes, until we left.

8          THE COURT:  Is there a document that embodies this

9  agreement?

10          MR. FRANKEL:  There's a document that embodies

11  $1,500.00 a day.  The understanding of the parties as to what

12  that means is something that will have to be elicited through

13  testimony because the document is unclear on that.

14          THE COURT:  Isn't this something that has to be

15  disclosed?  I realize this is a case where it may be nobody

16  votes but, you know, and we can tailor the disclosure statement

17  to that but don't you still have to have an approved disclosure

18  statement?  Anybody can still object to the plan even on

19  feasibility or other grounds.  It seems to me that if you do

20  owe another $450,000.00 -- but as they say, you're either going

21  to have to escrow that on the feasibility question because

22  you're cashing everybody out with interest on the effective

23  date --

24          MR. FRANKEL:  Your Honor, that issue is being raised

17

1  for the first time today.  The seller had obvious knowledge of

2  the contents of the contract and the unsecured creditors would

3  be paid 100 cents on the dollar regardless of this obligation.

4   So, I don't think that it would be necessary for disclosure

5  purposes.

6            THE COURT:  But it still -- well, all right.  See, in

7  a case like this where there is not going to be voting -- well,

8  let me take that back.  They're still impaired because

9  they're -- aren't they?  They're alleging they're entitled to

10  additional sums than you're prepared to pay under the plan.

11  But let's get past that and let's assume that we deem you to

12  have voted as a class against the plan.  So now you have to

13  cram it down.  How do you do that?

14            MR. FRANKEL:  Well, I can't.  I don't have another

15  impaired class.

16            THE COURT:  I thought you had another voting class.

17  Don't you have an unsecured class?

18            MR. FRANKEL:  Yes.  They're being paid in full plus

19  interest.

20            THE COURT:  Okay.  So how do you deal with that now?

21   You say they're not being impaired, they say they are being

22  impaired.  It seems like there's -- and that's a threshold

23  issue because we now know you can't confirm the plan if they

24  are being impaired and I deem them to vote against the plan.

18

1          MR. FRANKEL:  In that event we would need a decision

2    as to whether or not that $1,500.00 a day is a true obligation

3    that is due.

4          THE COURT:  How do I make that decision?  I don't

5    have any evidence.

6          MR. FRANKEL:  We'll put on a witness.

7          THE COURT:  All right.  Well, there are other

8    elements of confirmation.  Are you suggesting that we separate

9    out this issue and try it separately as to what the obligation

10   is to Mr. Orseck's client so we can determine whether or not

11   they're impaired?  Since if they are impaired in one sense

12   everything falls into place.  If they're not impaired, then

13   you're going to say that you're going to cash them out.

14         MR. FRANKEL:  That makes sense.

15         THE COURT:  Does that make sense to you?

16         MR. ORSECK:  It does.

17         THE COURT:  All right.  So let's try that issue, what

18   the amount of the obligation is to Mr. Orseck's client and

19   we'll fix that debt so we'll know.  Are you prepared to go

20   forward on that now?

21         MR. FRANKEL:  Yes.

22         THE COURT:  All right.  I take it it's primarily

23   documentary?

24         MR. ORSECK:  Yes.  I would -- let me get the

19

1  agreement if I may.

2          THE COURT:  Maybe I ought to read the agreement

3  first.  Maybe this is just a question of law that I can resolve

4  by reading the agreement.

5          MR. ORSECK:  I think that it is, Judge.

6          THE COURT:  Let me see.  Is this in the contract of

7  sale?

8          MR. ORSECK:  It's in one of the letters of --

9          THE COURT:  One of the letter agreements?

10          MR. ORSECK:  Yes.

11          MR. FRANKEL:  I can hand up the copies that I have.

12          THE COURT:  Okay.

13          MR. FRANKEL:  There's two letter agreements.  There's

14  a June 3, 2004 and a September 22, 2004.

15          THE COURT:  What were the dates?

16          MR. FRANKEL:  June 3rd and September 22nd.

17          THE COURT:  All right.  Why don't we mark them as

18  Debtor's Exhibits 1 and 2 so we have a record.  I'll mark the

19  earlier one dated June 3, 2004 as Debtor's Exhibit 1.  Any

20  objection to the receipt of the document?

21          MR. ORSECK:  No, sir.

22          THE COURT:  Okay.  It's in evidence.

23          (Letter Agreement, Debtor's Exhibit 1, Received.)

24          THE COURT:  The second document is dated -- now, you

20

1  gave me two --

2          MR. FRANKEL:  The second document is attached to the

3  first document.

4          THE COURT:  Okay.  I'm going to separate them.  The

5  second one which is -- the second letter which is dated

6  September 22 will be Debtor's Exhibit 2.  Any objection to the

7  receipt of that document, Mr. Orseck?

8          MR. ORSECK:  No, sir.

9          THE COURT:  Okay.  It's received.

10         (Letter Agreement, Debtor's Exhibit 2, Received.)

11         THE COURT:  Now, what is it that I should be reading?

12  Let's start with you, Mr. Frankel.

13         MR. FRANKEL:  Judge, the first document has in it on

14 Page 3 the last full paragraph, it starts, "In the event the

15 debtor fails to close on or before September 27th for each day

16 the [sic] continue to operate --"  that's obviously a typo --

17 "the premises, they shall become liable to the seller for the

18 additional sum of $1,500.00 until they quit the premises."

19 Now --

20         THE COURT:  Are you saying that goes away if you

21 close?

22         MR. FRANKEL:  Yes.  Part of the reason I'm saying

23 that is if you move on to the September 22, 2004 letter which

24 extended the closing date to November 27, 2004, it was set

21

1  forth in there what the new obligations were for the extension

2  and there was nothing in there about the $1,500.00 a day

3  continuing.  It's our position that given the payment of rent

4  rather than the $1,500.00 a day penalty that the $1,500.00 a

5  day penalty was for a failure to close altogether and then the

6  need for the debtor to vacate as provided in the initial June

7  3, 2004 letter.

8          MR. ORSECK:  Let me know when you're finished.

9          THE COURT:  I'm sorry, how did the second letter,

10 Debtor's Exhibit 2, change the deal?  Under the first -- as I

11 read -- let me step back.  As I read the June 3 letter it says

12 that you got to pay $1,500.00 a day for every day you're in

13 possession that you haven't closed.  Isn't that what it says?

14         MR. ORSECK:  Or until they vacate the premises.

15         THE COURT:  Or vacate the premises.

16         MR. ORSECK:  Yeah.  It's not open-ended.

17         MR. FRANKEL:  Your Honor, I did not see the $1,500.00

18 a day until you close.  It's $1,500.00 a day until you vacate.

19         THE COURT:  Okay.  So you owe them $1,500.00 a day.

20 You're in possession; right?

21         MR. FRANKEL:  That's one plausible reading I suppose

22 of the June 3rd.

23         THE COURT:  What's the other reading?

24         MR. FRANKEL:  But when you combine it --

22

1          THE COURT:  Okay.  Let me just stop there.  This is

2    the first letter.

3          MR. FRANKEL:  The way we read this is different than

4    that.  I understand the way the Court reads it.

5          THE COURT:  How do you read it?

6          MR. FRANKEL:  The way we read it is that there was

7    rental payments that were set forth in here that had to be paid

8    up to closing and then if we didn't close then we had to -- we

9    would no longer have a right to pay rent, we would have to

10   vacate.  At that point it became a penalty of $1,500.00 a day.

11         THE COURT:  When did the penalty kick in though?

12         MR. FRANKEL:  It kicked in on the closing date,

13   September 27, 2004.

14         THE COURT:  Okay.  All right.  So, after September

15   27th for every day you were in possession and there was no

16   closing you had to pay $1,500.00 a day; isn't that what this

17   means?

18         MR. FRANKEL:  No.  You're adding to it "and there is

19   no closing," and I don't think that that's --

20         THE COURT:  Well, if there's a closing you don't owe

21   them anything anymore.  Isn't the whole concept of this that as

22   long as you're in possession under this interim lease

23   arrangement after September 27th which was the initial closing

24   date, you've got to pay a penalty of $1,500.00 a day?

23

1            MR. FRANKEL:  That's not the way we read it.  The

2 way --

3            THE COURT:  Tell me how you read it.

4            MR. FRANKEL:  The way we read it is that if we, on

5 September 27th, didn't close and we were never going to close,

6 then it would be a $1,500.00 a day penalty until we vacated.

7            THE COURT:  Let me read it again.  Tell me again how

8 you read this.

9            MR. FRANKEL:  That this is a penalty for us not

10 closing and remaining in possession as opposed to us remaining

11 in possession pending the closing.

12            THE COURT:  That's not how I read this.  I'll tell

13 you I don't think that's a reasonable interpretation.  The

14 plain language is that if you don't close on September 27th for

15 every day you remain in possession it's a penalty, or an

16 additional sum as the letter says, of $1,500.00 a day until you

17 get out.

18            MR. FRANKEL:  Well, I think that when you read this

19 letter -- then I would ask the Court to look at the subsequent

20 letter --

21            THE COURT:  Okay.  All right.  Fair enough.

22            MR. FRANKEL:  -- and see whether that would change

23 the Court's opinion.

24            THE COURT:  All right.  Now, I was just focusing on

24

1  what that letter meant.  Now, let me just read this next

2  letter.

3                    [Pause in proceedings.]

4          THE COURT:  Okay.  Now, tell me about this letter.

5          MR. FRANKEL:  Your Honor, it's the debtor's position,

6  and Mr. Lefkowitz who was involved in the negotiation can

7  testify that --

8          THE COURT:  Well, unless it's ambiguous I don't need

9  testimony.  Tell me what you think it means.

10         MR. FRANKEL:  What this letter did was modify the

11 prior letter setting forth the debtor's obligations subsequent

12 to the September 27th date until closing and it did not have

13 the $1,500.00 a day as being an additional charge.

14         THE COURT:  Well, the next to the last paragraph says

15 "All other provisions of that letter agreement," meaning the

16 June 3rd agreement, "shall remain in full force and effect

17 except as modified above."  What do you think that means?

18         MR. FRANKEL:  I think what that means is that

19 generally the other obligations to pay the amounts due, meaning

20 the mortgage, the insurance, remain in effect but that the

21 $1,500.00 a day which was a penalty, since it's not included in

22 here and it would have been because it would have dwarfed any

23 other expense, that that shows that the $1,500.00 a day was

24 intended to be in the event of a breech and failure to vacate

1  post closing.  I believe that there's ambiguity on that issue

2  at least and Mr. Lefkowitz would testify that that was the

3  intent of the parties.

4           THE COURT:  Mr. Orseck?

5           MR. ORSECK:  I don't think testimony as to the intent

6  of an unambiguous agreement is appropriate.  I think that the

7  Court may draw the inference that the modification -- not the

8  modification, the further extension, the purpose of it was to

9  put down further -- additional considerations for a further

10  extension and it's just like the contract which is at issue in

11  the summary judgment motion.  The business people made a mature

12  judgment to sign an agreement which says that all of the terms

13  of the June 3 agreement shall remain in full force and effect.

14   There would have to be a specific modification and there just

15  isn't any and there wasn't intended to be any.

16           THE COURT:  Well, do you think that this agreement

17  also postponed the $1,500.00 a day penalty to the adjourned

18  closing date of November 29th?  In other words, this agreement

19  was entered into before the first scheduled, or I guess the

20  second scheduled closing date of September 27th.

21           MR. ORSECK:  That's correct.  That's correct.

22           THE COURT:  It extends the closing date to November

23  29th.

24           MR. ORSECK:  No, that's the second agreement which

26

they gave us the bad check for.

        THE COURT:  That's a different question.

        MR. ORSECK:  I'm sorry.

        THE COURT:  I mean, you know, there are a lot of questions I think about this second letter whether it's simply an offer of accord in which case you can sue under the original agreement, or whether it's a novation in which case you can only sue under this agreement, or it didn't change the first agreement and just supplemented it as set forth.  For those reasons I do think it's somewhat ambiguous.

        At a minimum it's ambiguous of whether the $1,500.00 a day penalty which was contained in the first letter and contemplated a September 27th closing with a penalty every day after that was in essence now not going to kick in until the new closing date of November 29.  It just doesn't seem reasonable to say that the debtor had to pay $1,500.00 a day in addition to these other obligations to extend the closing when the closing had been extended.  So, that's certainly a question I have under this agreement, let me finish, which is material to the issue we're talking about, whether or not it changes the underlying obligation to pay $1,500.00 a day even if it kicks in after November 29th as opposed to after September 27th.

        So, I will hear testimony.  I do think the agreement is ambiguous and I will hear testimony on what the parties

27

1  discussed.  Obviously, secret understandings or undisclosed

2  meanings don't bear on -- or undisclosed intentions don't bear

3  on what the parties intended because I have to know where their

4  minds met.

5          So frankly, you can call your witness who can give

6  evidence relating to what the parties intended.

7          MR. ORSECK:  Your Honor, before we do that, before we

8  do that, I would respectfully call the Court's attention to the

9  third page from the last on the second agreement.

10          THE COURT:  Third?  It's only a two-page agreement.

11          MR. ORSECK:  Yeah.  My pages aren't numbered.

12          THE COURT:  No, but the whole second agreement is

13  only two pages.  How can it be the third page from the last?

14  You're talking about the --

15          MR. ORSECK:  I'm sorry.

16          THE COURT:  You're talking about the September 22nd

17  letter?

18          MR. ORSECK:  Yes.  Judge, at the end of the second

19  agreement, the September agreement, it says, "This letter of

20  agreement shall be without prejudice to any and all rights of

21  our client --" and we're the ones who wrote the letter -- "with

22  respect to the purchaser's failure to comply with in terms of

23  the letter agreement dated June 3 and shall not be construed as

24  a waiver of any part."

1           THE COURT:  Right.

2           MR. ORSECK:  I think that that's pretty clear and the

3  intent, what the parties intended is really not what this is

4  about.  It's what they agreed to in writing.

5           THE COURT:  All right.  What you're arguing is the

6  agreement is unambiguous.  Let me just respond because I think

7  we're just arguing with each other at this point.

8           MR. ORSECK:  Yeah, which I don't want, yeah.

9           THE COURT:  First, the obligation to pay the

10  $1,500.00 a month [sic] had not even kicked in by the time --

11  this was June 3rd -- by the time the September 22nd letter had

12  been written.  That obligation wouldn't kick in until

13  theoretically I guess September 28th.  Under the original

14  letter this closing was scheduled for September 27th.  If the

15  debtor didn't close by that day then there would be this

16  additional obligation.

17           Also your argument suggests that nothing was changed,

18  no rights were changed from the first letter but yet the

19  preceding paragraph implicitly recognizes that there are some

20  modifications to the first letter.

21           MR. ORSECK:  But they're all intended to be in our

22  favor.  They're additional --

23           THE COURT:  Well, but you see now you're arguing that

24  I should construe the ambiguity in your favor.

29

1          MR. ORSECK:  Well, if there is ambiguity, I have no

2    right to ask you to construe an ambiguity.

3          THE COURT:  Well, I'll --

4          MR. ORSECK:  It's our position that it's not --

5          THE COURT:  I've already ruled it's ambiguous and

6    you've convinced me now that it's even more ambiguous than I

7    thought it was in the first place.  So I will hear testimony

8    relating to the intention of the parties.

9          MR. ORSECK:  All right.  Just prior to that, Judge,

10   we also make the legal argument that by stopping payment on the

11   check that this second agreement doesn't even kick in.

12         THE COURT:  What if it was a novation?  What if it

13   was a novation rather than an accord and satisfaction?

14         MR. ORSECK:  Well, it still has to be paid for.

15         THE COURT:  So you have a claim for the $30,000.00.

16   You may -- I mean it's part of -- well, fair enough.  You may--

17   it seems to me that they owe you more than $1.4 million.

18   Whether it's the additional $450,000.00 you claim or the

19   $30,000.00 stop payment or some other sum is what this hearing

20   is really about.  They owe you some money.  The question is how

21   much beyond the $1.4 million or 1.4 less the I guess the

22   deposit.

23         MR. ORSECK:  May I confer with counsel for one

24   second?

1          THE COURT:  Sure.

2                    [Pause in proceedings.]

3          THE COURT:  What's going on, gentlemen?

4          MR. ORSECK:  I'm sorry.

5          MR. FRANKEL:  It was a brief, unsuccessful attempt to

6   avoid testimony.

7          THE COURT:  Okay.

8          MR. ORSECK:  It gets right back to what we were

9   talking about before.

10          THE COURT:  Okay.  Go ahead.

11          MR. FRANKEL:  Mr. Jack Lefkowitz.

12          THE COURT:  Mr. Lefkowitz, would you raise your right

13   hand?

14          (Jack Lefkowitz, Debtor's Witness, Sworn.)

15          THE COURT:  Okay.  Would you state your name and

16   spell it for the reporter and speak into the microphone,

17   please?

18          THE WITNESS:  Jack Lefkowitz, L-E-F-K-O-W-I-T-Z.

19                    DIRECT EXAMINATION

20   BY MR. FRANKEL:

21   Q    Mr. Lefkowitz, could you please state your position with

22   the debtor?

23   A    Managing member.

24   Q    I'd like to show you documents that have been marked as

1 Debtor's 1 and Debtor's 2 in evidence.  I ask if you could

2 review them.

3 A    Yes, sir.

4 Q    Could you tell us what these documents are?

5 A    These were basically an extension on occupancy agreements.

6 Q    Were you involved in the -- did you sign these documents?

7 A    Yes, I did.

8 Q    Were you involved in the negotiation of these documents?

9 A    Yes.

10 Q    Could you tell me what the agreement was between the

11 parties as embodied in the documents with respect to the

12 $1,500.00 a day provision?

13         MR. ORSECK:  Oh, with respect to the $1,500.00?  I

14 object on the grounds that notwithstanding the Court's ruling

15 we believe to be unambiguous.

16         THE COURT:  Oh, well you don't have to keep making

17 that objection.  If that's your objection, it's overruled.

18 A    We basically had a use and occupancy agreement with the

19 sellers that we can occupy it for the months of July and August

20 of last year and we had agreed to a rental payment and

21 operating expense numbers and based on the extension where we

22 no longer were going to be paying rent because we're not going

23 to be occupying we had this $1,500.00 a day extension penalty

24 until we close.  So it's either we pay rent and all the

32

1  operating expenses or we pay the $1,500.00 a day.  It was never

2  intended to pay both.

3  Q     Could you explain how --

4          THE COURT:  What was the amount of rent that you were

5  paying?

6          THE WITNESS:  It was basically we were paying a

7  rental number plus insurance plus all the utilities plus all

8  the maintenance.  So every month it varied.  Plus we were

9  paying some credit card bills of their sellers.

10          THE COURT:  You say you had the choice after

11  September 27th to pay $1,500.00 a day or the rent?

12          THE WITNESS:  Well, in September we wouldn't be

13  paying rent anymore.  We wouldn't be occupying it, so it was

14  either/or.  Either occupancy or $1,500.00.

15          THE COURT:  I don't understand that.  I thought the

16  agreement was that after September 27th if you hadn't closed

17  you pay $1,500.00 a day.

18          THE WITNESS:  But we're no longer in a rental.  So he

19  was worried that we're not going to close, he doesn't have our

20  rental money.

21          THE COURT:  Right.

22          THE WITNESS:  So either we pay rent and all the

23  operating expenses or the $1,500.00 a day.  Never both.

24          THE COURT:  I understand that but are you saying that

33

1  after September 27th you had the choice of paying the lower

2  number, either rent or $1,500.00?

3          THE WITNESS:  It's basically the same.  $1,500.00 a

4  day is equivalent to $45,000.00 a month.  This is how much the

5  operating expenses we paid during the occupancy.

6          THE COURT:  Okay.

7          THE WITNESS:  So it's equivalent.

8  Q    Did anything change by the Debtor's Exhibit 2?

9  A    No.  We just kept on paying U&O and all the operating

10 expenses throughout the year.

11         MR. FRANKEL:  No further questions, Your Honor.

12         THE COURT:  Okay.

13         MR. ORSECK:  It's difficult to cross examine because

14 I really don't understand the answer to your question.

15         THE COURT:  You know, sometimes you have to know just

16 to sit down.

17         MR. ORSECK:  I think it's a good idea to sit down.

18         THE COURT:  Look, you're the lawyer.

19         MR. ORSECK:  I know.  I'm going to sit down.

20         THE COURT:  Okay.  You can step down.  Thank you.

21         THE WITNESS:  Thank you.

22         THE COURT:  Any other witnesses?

23         MR. FRANKEL:  No, Your Honor.

24         THE COURT:  All right.

34

1          MR. ORSECK:  We have no witnesses.

2          THE COURT:  All right.  Let me take these in chambers

3 and just read them again.

4                    [Off the record.]

5          THE COURT:  Please be seated.  The limited issue

6 presented to the Court was the amount of the claim by Mr.

7 Orseck's client which I'll call holdings for simplicity.  I

8 reviewed the two letter agreements that were presented for me.

9 As I read the first agreement and based upon the testimony of

10 Mr. Lefkowitz, I conclude that among other things it required

11 the debtor to pay the carrying charges of the property as well

12 as the mortgage of $9,750.00 a month, insurance of $2,500.00 a

13 month, interest on a certain credit card debt of $3,500.00 a

14 month.  Mr. Lefkowitz testified that that came to about

15 $45,000.00 a month.

16          The letter further divided in material part, this is

17 the first letter, that in the event that the debtor failed to

18 close on or before September 27th the debtor would have to pay

19 what I'll call a daily penalty or an additional sum of

20 $1,500.00 per month [sic].  Now, the letter is somewhat

21 ambiguous to the extent it doesn't really say whether the

22 debtor is also required to continue to pay the carrying charges

23 in addition to the $1,500.00 per month [sic.]  But based on Mr.

24 Lefkowitz's testimony which was not refuted that it was one or

35

the other but not both and the implication that the $1,500.00 a day was selected as the sum to match the monthly carrying charge I conclude at least under the first letter that if the debtor didn't close by September 27th then for every day thereafter that the debtor remained in possession and did not vacate it was liable for another $1,500.00 a day.

As I read the September 27th agreement on which there was no testimony, it only modified the -- well, it modified the September -- I'm sorry, the June 3rd agreement in two material respects with regard to the issue we're discussing. First, it eliminated the $3,500.00 per month obligation for payment of interest on the credit card which to me implies that the parties contemplated that they would extend the June 3rd obligations to the new closing date of November 29th. In other words, that the debtor was not liable for $1,500.00 a day but that the debtor would continue to pay the operating charges less the $3,500.00 a month.

It also imposed obligations, two additional new obligations. The first is the obligation to pay $20,250.00 if there's no closing -- or rather to pay an additional $20,250.00 for the extension but if the debtor didn't close on or before October 27th to pay another $20,250.00. It seems to me that those obligations are due under this agreement.

In addition, the September 22, 2004 agreement did not

36

1  otherwise refer to the post November 29th remaining in

2  occupancy but failing to close but does contain the provision

3  all other provisions of that letter agreement, meaning the June

4  3rd letter agreement, shall remain in full force and effect

5  except as modified above.  I rule that to say if the debtor did

6  not close by November 29th in addition to the $40,500.00 that

7  it had to pay in two lump sums under this payment agreement it

8  had to pay $1,500.00 a day while it remained in possession,

9  which according to Mr. Lefkowitz or according to any math comes

10 to about $45,000.00 a month.  The question I had is why the

11 debtor doesn't continue to remain obligated to pay that.  In

12 other words, that's the use and occupancy and why did we have a

13 separate hearing on use and occupancy?

14          MR. FRANKEL:  Judge, we continue to pay the carrying

15 costs and we continue to pay use and occupancy as fixed by

16 Judge Blackshear.

17          THE COURT:  Well, that's the question.  That's what

18 I'm a little confused about and I realize you're not involved

19 in this, Mr. Orseck, but why didn't holdings come in on day one

20 and say you're still in possession, you're accepting the

21 benefits of this interim occupancy agreement because you have

22 no other right to be on the premises, so pay me $1,500.00 a

23 day?

24          MR. FRANKEL:  They did.

1          THE COURT:  And what happened?

2          MR. ORSECK:  They did.  Judge Blackshear says it's --

3 I wasn't there and --

4          THE COURT:  Is there a transcript of this hearing?

5          MR. ORSECK:  -- and there was no hearing from what I

6 understand.  Judge Blackshear just said 5,000, that's it.

7 That's my understanding of what happened.  I wasn't there.

8          THE COURT:  All right.  Well look, you're only

9 pressed -- well, you're pressed for -- you got what you pressed

10 for on the adequate protection so I'm not going to revisit it.

11  But it seems to me that that's what you're obligated to pay

12 and you're probably entitled to a credit to the extent you paid

13 U&O because Mr. Lefkowitz's testimony was you didn't get both

14 so it doesn't seem while the agreements are arguably ambiguous,

15 I don't think that the holdings is entitled to both.  They're

16 entitled to $45,000.00 a month under these agreements.  I think

17 that's what you have to cure.

18          MR. LEFKOWITZ:  Your Honor, may I be heard?

19          THE COURT:  Why don't you talk to your lawyer first?

20               [Pause in proceedings.]

21          MR. FRANKEL:  Judge, I don't have a transcript from

22 the prior hearing.  The seller did come in and request that the

23 $1,500.00 be paid and Judge Blackshear asked what their costs

24 were, heard it, and ruled $5,000.00 a month.

38

1          THE COURT:  So you're saying that they lost that by

2   not appealing that decision, they're limited to the $5,000.00 a

3   month?

4          MR. FRANKEL:  That is the prior ruling from Judge

5   Blackshear.

6          THE COURT:  Yes, sir?

7          MR. ORSECK:  That can't be a final determination.

8   That was a sole adequate protection number which really just

9   permitted during the bankruptcy case the debtor to stay there.

10         THE COURT:  You know, Mr. Orseck, I was going to say

11   the same thing you said.  However, I will give you an

12   opportunity for you to demonstrate, which you're not going to

13   do right now, that on some theory the holdings is foreclosed

14   from getting the $1,500.00 a day.  It does sound to me -- and I

15   don't know what happened.  I don't know if there's a

16   transcript.  It does sound to me like that was just a

17   determination of adequate protection and I'm not sure that as a

18   matter of law an adequate protection order ever finally

19   determines what an underlying debt is because there are

20   different issues and this is fixing the amount of the claim, in

21   essence the amount that's necessary to cure if you're going to

22   assume this contract which is what we're really talking about.

23    But --

24         MR. FRANKEL:  Well, or --

39

1      THE COURT:  -- I will give you an opportunity to do

2  that but you have to continue to make the payments to them that

3  they're arguing about that I've ordered today which is

4  essentially the operating expenses that you've been paying plus

5  the 140 divided by 12.

6      MR. FRANKEL:  So we would continue to pay the

7  operating expenses plus 140 divided by 12?

8      THE COURT:  And I'll give you a briefing -- yes,

9  that's their adequate protection and I'll give you a briefing

10  schedule if you want to go that route, you know, to demonstrate

11  that somehow they're foreclosed from asserting that claim, that

12  it's been litigated before Judge Blackshear and they lost.  It

13  doesn't sound like it from what you've told me but, you know --

14      MR. FRANKEL:  To be honest with you, I don't have

15  great recall of that hearing.  It happened relatively quickly.

16   But I will order the transcript and we'll see what it says.

17      THE COURT:  Were any briefs put in on that?

18      MR. FRANKEL:  No.  There was the lift stay motion and

19  it was raised in argument and the Judge ruled summarily.

20      THE COURT:  Well, I'll give you that opportunity.

21  Let's talk a little bit about putting some sense to this

22  proceeding now because I have a lot of motions before me.

23      The first issue is I think you ought to modify your

24  disclosure statement.  Okay?  The only thing that has been

40

1  resolved today is the adequate protection on a going forward

2  basis.  They've raised the argument about what the cure costs

3  are.  I've issued a ruling and you have the right to contend to

4  demonstrate that they're foreclosed from asserting that.  You

5  know, I guess you could still confirm this case and escrow all

6  these monies and if they're right, they get them.  That's a

7  decision you can make unless you're going to make it right now.

8          The second thing is, you know, as I said I have

9  motions to dismiss or convert and the sense I got from Mr.

10 Orseck is that his motion to dismiss is really an objection to

11 the plan, that it's not feasible.

12         MR. ORSECK:  That's part of it but the reason for the

13 dismissal which was also an argument against confirmation is

14 bad faith before, during, after, right up to today and I think

15 that we can demonstrate that.

16         THE COURT:  So, do you want to withdraw your motion

17 to dismiss since you haven't served it and just litigate it as

18 part of the confirmation hearing as an objection to the good

19 faith of the debtor?  Because, you know, normally if you make a

20 motion to dismiss or convert I'd deal with that first.  It's a

21 threshold motion.

22         MR. ORSECK:  I appreciate that.  Yes, because if I

23 had grounds for the dismissal it would certainly, at least in

24 my estimation, be grounds to prevent confirmation.  I see it --

41

1  that's my judgment.

2          THE COURT:  All right.

3          MR. ORSECK:  So the answer is yes --

4          THE COURT:  All right.

5          MR. ORSECK:  -- we withdraw the motion to dismiss.

6          THE COURT:  We're going to deem the motion to dismiss

7  and convert withdrawn and we'll treat it as opposition to the

8  confirmation.  So, we've dealt with that.  Why don't you just

9  write a letter confirming that?  Okay?

10          MR. ORSECK:  I will do that.

11          THE COURT:  All right.  Now, I had cut you off.  Is

12  there something --

13          MR. ORSECK:  Before -- am I to submit an order on

14  the --

15          THE COURT:  Yes.  You should submit a separate order

16  which requires from July 1st on a going forward basis -- when

17  did you make your motion?

18          MR. ORSECK:  It was in June, but July 1st is fine.

19          THE COURT:  All right.  July 1st on a going forward

20  basis if they're obligated to continue to pay the operating

21  expenses plus I'm informed that the sum is $11,666.67 per

22  month.

23          MR. ORSECK:  Plus 1/12th of the taxes.

24          THE COURT:  Whatever those expenses are.

42

1          MR. ORSECK:  Right.  Okay.

2          THE COURT:  Right, 1/12th of the taxes.

3          MR. FRANKEL:  Your Honor, we're prepared to go

4    forward with the rest of the confirmation hearing today and

5    escrow the entire amount.

6          THE COURT:  Well, we haven't figured out what the

7    entire amount is.  Are you going to be able to prove that you

8    have the entire amount now?

9          MR. FRANKEL:  Yes.  The $1,500.00 a day from the

10   November 27th date plus the $20,250.00 that's due on the

11   extension agreement plus the $1.4 million.

12         THE COURT:  Well, it's actually $40,500.00 due on the

13   extension agreement.

14         MR. FRANKEL:  No, we paid the first.

15         THE COURT:  Oh, you paid the first $20,250.00?  They

16    paid that?

17         MR. ORSECK:  The paid --

18         THE COURT:  The first $20,250.00?

19         MR. ORSECK:  No.

20         THE COURT:  I thought that's the one you stopped the

21   check on.

22         MR. ORSECK:  That's not so.

23         MR. FRANKEL:  Oh, I'm sorry.

24         MR. ORSECK:  I disagree with the date.

43

1          MR. FRANKEL:  Oh, just one payment.

2          MR. ORSECK:  The date that they have to start paying

3 the $1,500.00 --

4          THE COURT:  No, stop.  The agreement said that you

5 pay $20,250.00 for the extension and I thought it said if you

6 don't close by October 27th you have to pay another $20,250.00.

7  Read the last sentence of the last paragraph on the first

8 page.

9          MR. LEFKOWITZ:  That was the payment that was

10 stopped, Your Honor.

11          MR. FRANKEL:  Did you pay the first one?

12          MR. LEFKOWITZ:  The first one was paid.

13          MR. FRANKEL:  The first one --

14          THE COURT:  Why would you have paid the second

15 payment at the end of September?  This letter was prepared --

16          MR. FRANKEL:  No, it's $20,000.00 upon return of the

17 letter which was September 22nd.  You stopped payment --

18          THE COURT:  Why would you have paid -- wait, wait.

19 Why would you have paid the second payment at the end of

20 September?  You had until October 27th to close.

21          MR. FRANKEL:  What I'm saying is that when we signed

22 the letter --

23          THE COURT:  You're saying that's the one that was

24 stopped.

44

1          MR. FRANKEL:  No, no, that's wrong.  It was the

2  second one that was stopped.

3          THE COURT:  Well, then I have a factual issue.  I

4  find it hard to believe that you made that second payment three

5  or four days later.

6          MR. FRANKEL:  The second -- it was not three or four

7  days later.  That was due monthly.

8          THE COURT:  Yes, and the payment was stopped with

9  that September 27th or 28th letter.  There was a $30,000.00

10  payment.

11          MR. FRANKEL:  It was $20,250.00 and $20,250.00.  The

12  first $20,250.00 was paid.  The second $20,250.00 was stopped.

13   Well, we'll produce checks.

14          THE COURT:  All right.  Well, in the meantime you'll

15  have to ask for the entire sum.

16          MR. FRANKEL:  Ask for the entire sum.

17          THE COURT:  I just find it hard to believe that that

18  second $20,250.00 payment was made three days or four days

19  after you paid the first payment.  You had until October 27th.

20   What if you closed by October 27th?  You'd never owe it.

21          MR. FRANKEL:  Judge, it's a month later.

22          MR. ORSECK:  Judge, there's no point arguing.  They

23  didn't give us either one.  There's no point arguing about what

24  is.

45

1          THE COURT:  He says you did get one of them.

2          MR. FRANKEL:  I think that --

3          THE COURT:  We'll escrow it.  Just escrow.  So, what

4  are you going to escrow?

5          MR. FRANKEL:  We'll escrow it.  It's not a philosophy

6  question.  It's we'll have the check and we'll show it.

7          THE COURT:  All right.  So what's the total amount?

8  Let's just agree on the amount that has to be escrowed.

9          MR. FRANKEL:  It will be $40,500.00 plus $1,500.00 a

10 day from -- less the amounts that we've paid for use and

11 occupancy and carrying costs and plus the $1,260,000.00 on the

12 contract.

13         THE COURT:  Well, I have to know how much it is for

14 feasibility purposes.  Why don't we do this.  I have a Judges'

15 meeting at 12:30.  Let's reconvene at 2:00.  See if you can

16 agree on the amounts that are going to have to be paid or

17 escrowed and then we can move on with the rest of it.  Okay?

18 Maybe we'll save some time that way.  See what else you can

19 agree on in terms of the other elements of 1129(a).

20         But I come back to the question -- I guess they're

21 unimpaired is what you're saying.

22         MR. FRANKEL:  Yes.

23         THE COURT:  Before we go, is there any dispute now

24 that you're -- I think if you're escrowing it and not paying it

46

1  to them, they're still impaired; aren't they?  That was the

2  question I had when I read your plan and disclosure statement.

3         MR. FRANKEL:  Your Honor, I think it's often the case

4  in plans where the undisputed portion is paid, the disputed

5  portion is escrowed and that makes the creditor unimpaired.

6  That happens all the time.  It's a question of whether or not

7  they're getting --

8         THE COURT:  That's true, it does.  What's your

9  position?

10        MR. ORSECK:  Well, we also take the position that --

11 the alternative position that the contract ceased to be of

12 any -- it's not enforceable by them and they can't --

13        THE COURT:  Why can't they?  There seems to be no

14 question that they're assignees with a contract.  Why can't

15 they assume and assign it by curing all the defaults?

16        MR. ORSECK:  Because there was a time of the essence

17 that went by and with due respect to the Bankruptcy Court, it's

18 a state law that applies.  We can argue that they lost any

19 rights to conveyance of that property when they gave us that

20 bad check on the --

21        THE COURT:  Why don't we do this?  You can reserve

22 that argument.  I'll take briefing on this one.  But assuming

23 you -- once we fix the amount, you can put on your case, put on

24 your case.  You can brief the issue of whether or not you're

1  impaired or not and entitled to both because there's been a

2  concession that if you're impaired and entitled to both they

3  don't have an accepting class and I can't confirm.  That's

4  really a legal issue.  I don't need evidence on that assuming

5  that one, we figured out how much you're owed and two, that

6  they demonstrated that they can escrow that and they will

7  escrow that.  So it's a legal issue we can put aside.

8            I guess you could also argue that the underlying

9  agreement is not assumable as a matter of law even though the

10  bankruptcy was filed before the closing date.

11            MR. FRANKEL:  Your Honor, given the Court's schedule

12  I think that we would prefer to adjourn than to come back later

13  today if that's --

14            THE COURT:  Come back at 2:00.

15            MR. FRANKEL:  We prefer to adjourn the hearing to

16  another date rather than --

17            THE COURT:  Well, maybe we can resolve some of these

18  issues beforehand.  There may not be a purpose to another

19  hearing.  In other words, if the law is by simply escrowing

20  this creditor's claim and not paying it, you're impairing them

21  and if they're impaired they're entitled to vote and if they

22  don't vote in favor of the plan, which they're obviously not

23  going to do, you can't confirm.  Maybe that's an issue we

24  should deal with.

48

1          MR. FRANKEL:  There's a lot of issues that are being

2     raised and I think --

3          THE COURT:  Well, yes, I know.

4          MR. FRANKEL:  -- I think it makes sense to adjourn it

5     and to try to work out some of these issues before we come back

6     with an evidentiary hearing.

7          THE COURT:  Let me ask you a question.  This is

8     really I mean a dispute between holdings and the debtor about

9     the amount of money that's going to be paid.  Does it make

10    sense to send this to mediation where both sets of clients have

11    to come in and not just the lawyers?

12         MR. FRANKEL:  Yes.

13         THE COURT:  Mr. Orseck?  I take it as long as you're

14    getting the adequate protection payments you're not being

15    harmed by the continuation of this bankruptcy however it turns

16    out.  If it's dismissed you'll still have your claim less your

17    adequate protection payments presumably.  Meanwhile you're

18    getting money.

19         MR. ORSECK:  Judge, I don't think there's anything to

20    mediate, with all due respect.  I think it's arithmetic.

21         THE COURT:  It's not arithmetic.  I'm talking about

22    not just the amount of your claim but the underlying issue of

23    whether and how much the debtor is going to pay for the

24    property.  That's really what the -- that's what this is all

49

1  about.  The more I see about this you probably are owed more

2  than $1.4 million because there are these other obligations

3  that you're entitled to receive one way or the other.

4          Before you do any briefing I'm going to appoint a

5  mediator.  Issue an order appointing a mediator today in this

6  matter.  You'll have seven days to see if you can agree on a

7  mediator.  This person can mediate the entire plan because

8  that's really what we're talking about.  If you don't agree in

9  seven days I'll ask you, Mr. Frankel, to write me a letter just

10 saying that you haven't agreed --

11         MR. FRANKEL:  Okay.

12         THE COURT:  -- and then I will appoint a mediator to

13 deal with this issue.  All right?  Because -- and one of the

14 reasons I'm doing this is we seem to be spinning a lot of

15 wheels and every time I hear something another issue comes up

16 and the case really isn't keyed up to be confirmed.  I haven't

17 approved the disclosure statement.  The disclosure statement

18 doesn't disclose all these issues that have come up.  It may be

19 that they're entitled to vote.  I don't know.  That's not only

20 a threshold issue, it's a key issue because if they are

21 entitled to vote and they vote against the plan, that's the end

22 of the case.

23         MR. FRANKEL:  It would be the end of the plan.

24         THE COURT:  The end of the plan.  But before we get

50

1 to all that I think it's worthwhile to appoint a mediator and

2 see if a mediator can resolve these issues and maybe bring an

3 agreement among the parties.  Now, the clients do have to

4 appear at the mediation.  If it's more convenient, you know,

5 you can select someone upstate if that's a more convenient

6 location.  I don't know.  Undoubtedly more convenient for Mr.

7 Orseck's clients and I think you would want them at this

8 mediation.  But I just mention that.

9         MR. ORSECK:  Judge, the order though, in other words,

10 there is a --

11         THE COURT:  The adequate protection order, you can

12 settle an order for the adequate protection order.

13         MR. ORSECK:  And the $1,500.00.  You made findings.

14 I don't want to appear that I'm being pushy but it would appear

15 to me that you made --

16         THE COURT:  But you see the reason I had that

17 question is when you came in here for adequate protection you

18 asked for a certain amount and you got it.  It may be that if

19 they have to close and cure they have to pay that $1,500.00 but

20 they don't have to cure a contractual default if that's what it

21 is and that's what it appears to be until they assume the

22 contract.  I'm not going to tell them that they --

23         MR. ORSECK:  Oh, yeah.

24         THE COURT:  I'm not going to tell them they got to

51

1  pay a contractual cure cost as adequate protection.

2          MR. ORSECK:  Oh no, no, no.

3          THE COURT:  I have ruled --

4          MR. ORSECK:  I didn't say that.

5          THE COURT:  I have ruled -- if what you're asking is

6  have I ruled that they're obligated to pay $1,500.00 a day for

7  every day they didn't close after November 29th and they

8  remained in possession less what they paid for use and

9  occupancy, yes, I've ruled that.

10          MR. ORSECK:  Oh, that's --

11          THE COURT:  But they don't have to pay that as

12  adequate protection.  You made an application and you've gotten

13  what you've gotten.

14          MR. ORSECK:  I understand.

15          THE COURT:  All right.

16          MR. FRANKEL:  Judge, you'll be issue the order or do

17  you want me to submit the order on mediation?

18          THE COURT:  We'll issue the orders.  We'll issue an

19  initial order today which will give you seven days to select a

20  mediator.

21          MR. FRANKEL:  Thank you.

22          MR. ORSECK:  It's still my obligation to settle the

23  other ones.

24          THE COURT:  Yes.  You should say it's your obligation

52

1 and it's your strong interest I would think to settle that

2 order which relates to adequate protection.  I would do that

3 immediately.

4          MR. ORSECK:  I will do that.

5          THE COURT:  All right.  Also, write a letter

6 withdrawing your --

7          MR. ORSECK:  I will do that too.

8          THE COURT:  -- the aspect of your motion which is the

9 motion to dismiss or convert without prejudice to your right to

10 raise the issues as opposition to confirmation.

11          With respect to your disclosure statement, you're

12 going to have to file a new disclosure statement in this case

13 anyway.  You want to just withdraw that so I don't have to keep

14 having conferences on that?  Do you have a status conference,

15 status conferences in this case?

16          MR. FRANKEL:  No.

17          THE COURT:  All right.  Why don't you go next door?

18 Have you ever submitted a case management order in this case?

19          MR. FRANKEL:  This case has been around for a couple

20 of years.  I don't think so.

21          THE COURT:  Well, it's not quite that old.

22          MR. FRANKEL:  A year.  No, we've never submitted a

23 case management --

24          THE COURT:  All right.  Why don't you get a date from

53

1  Ms. Parks about 30 days out --

2          MR. FRANKEL:  Okay.

3          THE COURT:  -- 45 days out and submit a case

4  management order just so we don't lose track of it.  I will for

5  present purposes mark the disclosure statement off.  The

6  evidentiary hearing has been dealt with.  We've dealt with the

7  adequate protection issue.  You can actually settle an order

8  fixing the amount of the claim as what I said, the $1,500.00 a

9  day after November 29th less the monthly payments that they've

10 made for U&O plus the $40,000.00 -- actually I take that back.

11  There's a dispute as to that, whether that 40 -- you can say

12 it's the $40,450.00 without prejudice to the debtor's right to

13 show that it paid one of those payments.  Okay?  We'll deal

14 with it that way.

15         MR. FRANKEL:  Judge, hadn't you also said that you

16 were reserving our rights on the issue of Judge Blackshear's

17 prior order fixing --

18         THE COURT:  Oh yes, yes, yes, I take it back.  I take

19 it back.  I made those findings but then he raised the issue

20 that you were foreclosed from seeking those sums.  In the

21 absence of the legal issue the order can say that without

22 prejudice to your right to contend that the debtor is

23 foreclosed from seeking these amounts based on Judge

24 Blackshear's prior rulings.

54

1          MR. FRANKEL:  I think also there was the carrying

2    costs that we continue to incur subsequent to the --

3          THE COURT:  I said you're entitled to a credit

4    against the $1,500.00 daily --

5          MR. FRANKEL:  Right.

6          THE COURT:  -- expense because Mr. Lefkowitz --

7          MR. FRANKEL:  Right.

8          THE COURT:  -- testified it was either $1,500.00 a

9    day or the carrying costs which he said were $45,000.00 a month

10   although --

11         MR. FRANKEL:  So we --

12         THE COURT:  Let me finish.  Although I looked at the

13   operating statements, they didn't appear to be that high.  But

14   I don't think holdings is asking for nor is entitled to double

15   recovery.

16         MR. FRANKEL:  Okay.

17         THE COURT:  Why don't you settle an order which

18   includes these rulings and the reservations we've discussed?

19   Otherwise, we will just never remember this when the time

20   comes.  We can hold off the briefing on the issue of whether or

21   not they're impaired although that may ultimately become a

22   question if it's not resolved by the mediator.  Okay?

23         MR. FRANKEL:  Okay.

24         MR. ORSECK:  Judge, there's one matter that I need

55

1  some clarification.  It's our position that when the $20,500.00

2  check was not paid which was given in conjunction with the

3  September letter that the $1,500.00 starts right away because

4  there was a breech and they were in possession for nothing.

5          THE COURT:  You keep raising more issues, Mr. Orseck.

6   The question was -- certainly the agreement doesn't say that

7  you have a claim for the $20,500.00.  The letter agreement, I

8  don't know, did it terminate automatically?  There was a

9  question of whether the agreement terminated I suppose.

10 Apparently the letter agreement is terminating automatically if

11 they fail to make those payments.  I guess I understand your

12 argument that they had to close as of September 27th by not

13 paying for that extension.  Why don't you reserve that as a

14 right that you can also argue?  Okay?  Is there anything else?

15         MR. FRANKEL:  Yes, Judge.  We may have a settlement.

16         MR. ORSECK:  Judge --

17         THE COURT:  You may have a settlement now.

18         MR. ORSECK:  We may have a settlement.

19         THE COURT:  Look, I have a judges' meeting.  Can you

20 discuss this?  I hate to keep you around.  Discuss it and come

21 back at 2 or another time because I have to go.  Why don't you

22 go out to lunch?

23         MR. FRANKEL:  Yeah, okay.  Fine.

24         THE COURT:  Discuss it.  We'll reconvene at 2:00.

56

1  Okay?

2          MR. FRANKEL:  Okay.

3                      [Off the record.]

4          THE COURT:  Gentlemen.

5          MR. FRANKEL:  Mark Frankel; Backenroth, Frankel and

6  Krinsky, attorneys for the debtor.  Your Honor, I'm pleased to

7  report that we have a settlement of this case with the seller.

8   The debtor has agreed to close on, and the seller has agreed

9  to allow the debtor to close on the sale of the subject real

10 property at a total purchase price of $1,725,000.00, so at

11 closing we will pay that amount less the $140,000.00 that was

12 paid as a deposit.  There will be a closing adjustment for

13 taxes that have been prepaid by the seller through the date of

14 closing.  We anticipate doing this closing as soon as it's

15 practical in terms of real estate attorneys getting the title

16 reports and so forth.  We would ask the Court to keep

17 jurisdiction over the case during that period and then we will

18 make a motion to dismiss as a structure dismissal.

19         THE COURT:  In order to close though, that's a

20 transaction outside of the ordinary course of business.  You're

21 in bankruptcy.  How are you going to do it?

22         MR. FRANKEL:  Well --

23         MR. ORSECK:  Judge, before we do that, there's one

24 other item that we agreed on.  Is this on the record?

57

1          THE COURT:  Yes.

2          MR. ORSECK:  Oh, okay.  The transfer --

3          THE COURT:  This is a settlement on the record.

4          MR. ORSECK:  Yes.

5          THE COURT:  This is binding.

6          MR. ORSECK:  Yes, of course.  The transfer taxes,

7  recording fees are all to be paid by the purchaser.

8          THE COURT:  Why wouldn't you want to settle under a

9  plan and save those taxes?

10          MR. FRANKEL:  They're nominal upstate.

11          THE COURT:  Okay.  All right.  So is that in

12  satisfaction of all obligations and liabilities interstate?

13          MR. ORSECK:  That is correct, Your Honor.

14          THE COURT:  Is that correct?

15          MR. FRANKEL:  Yes.

16          THE COURT:  All right.  So as I understand the

17  transaction, the debtor will pay $1,725,000.00 less credit to

18  the $140,000.00 but plus certain real estate obligations did

19  you say?

20          MR. ORSECK:  The real estate taxes we paid in

21  advance, so they're adjustments.

22          THE COURT:  Okay.

23          MR. ORSECK:  In other words, the taxes that came due

24  January 1, 2005, assume we close in August, they'll have to

58

1  reimburse us for August, September, October, November,

2  December, five-twelfths.  The school tax goes from September to

3  September, so they'd have to reimburse us one-twelfth of the

4  school tax.  You understand that?

5          THE COURT:  I mean but as of what point do they

6  become liable?

7          MR. ORSECK:  It's an adjustment, an addition to the

8  purchase price.

9          THE COURT:  I understand that but you've been paying

10  taxes for many years.  At what point does the tax become their

11  liability that they have to pay for?  Oh, you mean if you

12  prepaid --

13          MR. ORSECK:  No, it's only an adjustment for the

14  current year.

15          THE COURT:  I got you.  Okay.

16          MR. ORSECK:  All prior taxes have all been paid.

17          THE COURT:  Right.  Is that --

18          MR. FRANKEL:  Yes.

19          THE COURT:  -- agreeable to the debtor and is that

20  agreeable to the seller?

21          MR. ORSECK:  Yes.

22          THE COURT:  Okay.  Then the matter is deemed settled.

23   I think you can do it one of two ways.

24          MR. FRANKEL:  Okay.

1          THE COURT:  If you want me to retain jurisdiction

2   then you should probably make a motion to assume the contract

3   or stipulate to assume the contract, include the resolution.  I

4   deem it still settled.  This is just a procedural issue.

5          MR. FRANKEL:  Right.

6          THE COURT:  Settle it on notice that you're going to

7   assume it and this is what the deal is.  Then after it's

8   assumed I guess you can dismiss the case if that's what you

9   want to do.

10          MR. FRANKEL:  Is there a second option you --

11          THE COURT:  Well, you could do it, you know, you can

12   sell it under a confirmed plan.

13          MR. FRANKEL:  Okay.

14          THE COURT:  That's going to be longer and more

15   expensive.  I don't see the reason to do that, frankly.  Or you

16   could simply dismiss the case now and do it outside of

17   bankruptcy.

18          MR. ORSECK:  Yeah, that was my suggestion but he

19   didn't want to do that.

20          MR. FRANKEL:  I would like to do that except for the

21   fact that if there's a problem I don't want to have to start a

22   lawsuit in Sullivan County.

23          THE COURT:  All right.  So why don't you do this?

24   Why don't you settle a stipulation on ten days notice that

60

1 provides for the assumption of the sale contract under the

2 terms you've set forth and that's it.  Then you can make a

3 separate motion or settle an order on the creditors dismissing

4 the bankruptcy if that's what you want to do.  I don't want to

5 get involved though in determining fees or anything.

6        MR. ORSECK:  I will do that tomorrow.  I don't need

7 any ten days.  I would sure appreciate if you'd shorten that

8 time because we're paying a premium mortgage interest rate, my

9 client, and every day the sooner we close, you know, we save

10 money.

11        THE COURT:  Who else -- well, I don't think you have

12 to give notice to all creditors for a motion to assume.  Let me

13 just --

14        MR. FRANKEL:  There's only about six creditors.  I

15 could send it out by Fed Ex.

16        THE COURT:  He's more concerned about the ten day

17 period than the number of creditors.

18        MR. FRANKEL:  We may be able to get their consent on

19 most of them.  I don't know about the lawyers in the case who--

20 and other professionals but --

21        THE COURT:  I would suggest you order this

22 afternoon's transcript in case there's any question about what

23 the settlement terms are.

24        MR. FRANKEL:  Okay.

61

1          THE COURT:  Try and come up with a stipulation within

2   the next two days and then order it if you can because as I

3   said, I consider it settled under these terms and what we're

4   really talking about is the mechanics now.

5          Okay.  I don't see where you really necessarily have

6   to give notice to anybody else for the amount of time required.

7    I don't see -- is it one of the types of motions in 2002?

8          MR. FRANKEL:  It's a 9019 motion.  It would be --

9          THE COURT:  Yes, but why don't we do this?  Why don't

10  you submit your stipulation?  Okay?  You should probably settle

11  it on notice to the U.S. Trustee say on three days notice.

12         MR. FRANKEL:  Okay.

13         THE COURT:  It should provide that in the event that

14  there's no objection no hearing will be held or the Court may

15  not hold a hearing.

16         MR. FRANKEL:  Okay.

17         MR. ORSECK:  Judge, I'm not really looking for legal

18  advice but I really am.

19         THE COURT:  Well, you're not going to get legal

20  advice.

21         MR. ORSECK:  Okay.  Is there any way for the Court to

22  retain jurisdiction on a dismissed case?  If it is --

23         THE COURT:  Well, I can dismiss it and then you can

24  reopen it if there's a dispute I suppose since he's made an

62

1 agreement in Bankruptcy Court.

2          MR. ORSECK:  Why don't we do that?

3          THE COURT:  I don't know if that gets you anywhere

4 any faster but you can do that.

5          MR. ORSECK:  On the record, I would not oppose any

6 application even on one day's notice without an order to show

7 cause to reopen.  I think it would be so much simpler and then

8 we can just start --

9          THE COURT:  It's not necessarily simpler.  Let me

10 tell you why.

11          MR. ORSECK:  I'm sorry.

12          THE COURT:  Nobody has gotten notice of the dismissal

13 motion and that's something people are entitled to and there

14 may be other creditors who come in and say these guys owe us

15 money, I don't want it dismissed.

16          MR. ORSECK:  They were all here today.

17          THE COURT:  Well, I don't know.  They were here for a

18 different reason because they were subpoenaed.  Why don't you

19 do your deal, this way you can do it within the context of the

20 bankruptcy.  In the interim you could make the motion to

21 dismiss, but it's not such a big deal once you've concluded the

22 real estate transaction which is what this case is about

23 anyway.

24          MR. FRANKEL:  So, settle a stipulation on three days

63

1  notice.

2            THE COURT:  Yes, you might as well settle it on the

3  U.S. Trustee and the other six creditors and that's the deal.

4            MR. FRANKEL:  And say that if there's an objection

5  that there may be a hearing.

6            THE COURT:  Yes, the Court will schedule a hearing if

7  it deems one necessary.

8            MR. FRANKEL:  Okay.

9            THE COURT:  Okay.  Thanks very much.

10            MR. ORSECK:  Thank you.

11            MR. FRANKEL:  Thank you for all your help, Judge.

12            THE COURT:  Sure.  By the way, Mr. Frankel, since I

13  won't have to decide it, I mentioned to you in chambers under

14  New York law the assignee of the contract doesn't get the tort

15  claims unless the assignment specifically says it.  It's never

16  in the contemplation of the parties because they don't know

17  about the fraud when they take assignment.

18            MR. FRANKEL:  My partner had been worrying about that

19  issue for quite some time.

20            THE COURT:  Yes.  I discovered it when I was doing

21  research on I think the equally questionable tax map

22  designation issue which with a little research I could have

23  ruled on from the bench, frankly.

24            MR. ORSECK:  It was a fun case.

64

1          THE COURT:  Okay.  Well, have a good trip home.

2          MR. ORSECK:  Okay, Judge.

3                    * * * * * *

4

5

6

7

8

9

10     I certify that the foregoing is a court transcript from an

11 electronic sound recording of the proceedings in the above-

12 entitled matter.

13

14

15                              Mary Greco

16 Dated:  July 26, 2005

17

18

19

20

21

22

23

24

65

1

2

3

4

5

6

7

8

9